NOTICE
Decision filed 09/24/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 240627-U

NOS. 5-24-0627, 5-24-0628, 5-24-0629 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* AYDIN L., JIMMIE L., and STORMY L., Minors | ) ) ) | Appeal from Circuit Court of Marion County. |
| (The People of the State of Illinois, | ) ) | |
| Petitioner-Appellee, | ) ) | Nos. 21-JA-74, 21-JA-75, 21-JA-76 |
| v. | ) ) | |
| Vincent L., | ) ) | Honorable Ericka A. Sanders, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE MOORE delivered the judgment of the court.
Justices McHaney and Sholar concurred in the judgment.

**ORDER**

¶ 1     *Held*:    Evidence amply supported the circuit court's findings that respondent was unfit and that the minors' best interests required terminating his parental rights. As any contrary argument would be frivolous, we allow appointed counsel to withdraw and affirm the circuit court's judgment.

¶ 2     Respondent, Vincent L., appeals the circuit court's order finding him to be an unfit parent and terminating his parental rights to Aydin L., Jimmie L., and Stormy L. His appointed appellate counsel concludes that there is no issue that could support an appeal. Accordingly, he has filed a motion to withdraw as counsel, along with a supporting memorandum. See *Pennsylvania v. Finley*, 481 U.S. 551 (1987). Counsel has notified respondent of this motion, and this court has provided him with ample opportunity to respond. However, he has not done so. After considering the record

1

on appeal and counsel's motion and supporting memorandum, we agree that there is no issue that could support an appeal. Accordingly, we grant counsel leave to withdraw and affirm the circuit court's judgment.

¶ 3                                              BACKGROUND

¶ 4    On July 2, 2021, the State filed a petition for adjudication of wardship alleging that respondent and Samantha M. had neglected Aydin L., Jimmie L., and Stormy L. The petition alleged that the children were left unsupervised with respondent and his girlfriend, Nell W., despite a prior "indicated" finding that he had sexually assaulted a child, and that Nell W. had previously had her children removed from her care. Moreover, the children's siblings were previously made wards of the court and the conditions that brought them into care had not been corrected.

¶ 5    Following a shelter care hearing, the court found probable cause to believe that the children were neglected. A service plan dated August 17, 2021, required respondent to complete an integrated assessment (IA). Reports showed that in a 2019 case, respondent had been tasked with completing a sex offender evaluation, a mental health assessment, a psychiatric evaluation, and a parenting program, and these requirements were carried forward.

¶ 6    At an adjudicatory hearing, respondent admitted that the children had been left alone with him. The court found the children neglected.

¶ 7    Following several service plan reviews and permanency hearings, the State, on May 3, 2023, filed a petition to terminate parental rights. It alleged that respondent had failed to maintain a reasonable degree of interest, concern, or responsibility for the minors' welfare; deserted them for more than three months; and failed to make reasonable efforts or reasonable progress toward their return home during two separate nine-month periods—September 2, 2021, to June 2, 2022, and June 3, 2022, to February 3, 2023.

¶ 8    At the fitness hearing, Kendra Shuler testified that she was the family's caseworker throughout the case. She evaluated respondent on each service plan and never rated him satisfactory in anything besides cooperation and communication with the agency. Even at the time of her testimony, respondent still had not completed a sex offender evaluation.

¶ 9    Shuler personally supervised respondent's visits early in the case. He ended two visits early because the children threw fits, and he was unable to cope with their behavior. In December 2022, he told Shuler that he was concerned about being able to manage his mental health so that he could parent his children. He said that he did not really have much hope of correcting the situation in the future. He told her also that his past efforts to engage in mental health treatment caused him to have nightmares, stress, and anxiety to the point he could not function in daily life. As a result, he was not initially willing to participate in services. He eventually did so to some extent but had stopped by May 2022.

¶ 10    Shuler rated respondent as unsatisfactory the tasks of obtaining housing, work, mental health services, and a sex offender assessment. Respondent did not complete that assessment because the assigned assessor wanted respondent to admit to sexual abuse and respondent denied doing anything wrong. Shuler then attempted to find another evaluator. An appointment was set up but, in November 2022, respondent was involved in a car accident and was unable to attend. He made no further progress from that time until February 3, 2023.

¶ 11    Shuler did not doubt respondent's love for his children, but his ability to manage their behaviors was compromised. Also, respondent never verified his income. His house smelled foul and was infested with cockroaches. He never progressed to unsupervised visits, nor did he request them. There was no time between September 2021 through February 3, 2023, during which he made sufficient progress that Shuler even discussed the return of the children to him.

3

¶ 12   The court found respondent unfit for failing to make reasonable efforts or reasonable progress during the two nine-month periods alleged in the petition. The court did not address the petition's other allegations.

¶ 13   At the best interests hearing, Linda Webster testified that she has been the foster mother of Aydin and Jimmie for two years. She had engaged them in activities, taken them to counseling, and cared for them regularly. However, she was 63 years old and unwilling to adopt them. She acknowledged that Jimmie wanted to stay with her until he turned 18, but she had told him he could not. She agreed that the boys needed a forever home, but did not believe she could provide one. She hoped another family could do more for them than she could. Until that happened, she was willing to serve as their foster parent; if no family could be found, she would be willing to keep them in her home but would not formally adopt them.

¶ 14   Caren Sullens testified that she had been caring for Stormy since January 2024. She described Stormy as very sweet, but with some problems. She loved her but, as a 73-year-old widow, could not provide her with the father figure that she wanted. Ideally, a two-parent family would adopt Stormy because she talked a lot about being adopted. If such a family could not be found, Sullens was willing to keep her to prevent her being returned to the foster-care system.

¶ 15   Shuler testified that she had visited with the children in their respective foster homes. Jimmie wanted to stay with Webster until he turned 18. Aydin wanted a home with two parents. Jimmie was still angry with his parents, but Aydin wanted to establish a relationship with his mother.

¶ 16   In researching potential placements with extended family, Shuler had located some distant relatives in Colorado. Four different relatives in Colorado were willing to take in the children, including an older sibling not part of this appeal. Communication with those families had been

4

ongoing since December 2023, during which Shuler had explained the many issues the children dealt with, including some of the more troublesome behaviors. The family willing to adopt Aydin was fully aware of his problematic sexual acting out, as well as his learning disabilities and behavioral outbursts, and were not put off by it. A different family member was willing to adopt Jimmie. Shuler had advised that family of his explosive outbursts, tendency to run off, to get in trouble at school and to use vulgar language, but also that he was extremely smart and that he responded well to structure. The family interested in adopting Stormy had been told that she was very bright, sweet, energetic, caring and imaginative, and that she got along well with other children. They were also made aware that she lied a lot, and had ADHD, requiring her to be frequently redirected.

¶ 17    The potential Colorado placements were all part of the same tight-knit family that spent a great deal of time together, so placement in these different homes would allow the children to spend time together, despite being in different placements. All the potential homes had committed to background checks, being fingerprinted, and developing care plans to manage the children's behaviors. Each family would need to complete a home study and complete the required foster parent classes and become licensed foster homes. Each family could provide for the children financially. Because the process of evaluating the potential homes was incomplete, Shuler had not spoken to the children about the possibility of moving to Colorado.

¶ 18    Should the parents' rights be terminated, Shuler would take the children to Colorado at least twice to ensure the placements would work. Upon return from those visits, she would request a Colorado social worker referral so a social worker would be in place prior to the children being placed there. Shuler would continue visiting the children in Colorado quarterly to ensure the that they were doing well and that referrals to services were made. Shuler believed Colorado placement

5

was in the best interests of all three children. Should those placements fall through, however, Stormy could stay with Caren and her sister. Shuler would search for new foster parents for Aydin and talk further with Webster about a plan for Jimmie. Shuler admitted it was possible that, despite all good intentions, the Colorado placements might not be successful. However, she remained optimistic that, should those placements not work out, she had a backup plan for each child.

¶ 19    Respondent testified that he loved his children. He believed that he could safely parent them despite his mental health conditions.

¶ 20    The court found it in the minors' best interests to terminate both parents' rights. Respondent timely appealed.

¶ 21                                    ANALYSIS

¶ 22    Appellate counsel concludes that there is no reasonably meritorious argument that the circuit court erred by finding respondent unfit and terminating his parental rights. We agree.

¶ 23    A proceeding to terminate a party's parental rights under the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2022)) occurs in two stages. *In re Deandre D.*, 405 Ill. App. 3d 945, 952 (2010). First, the State must establish that the parent is "unfit to have a child" under one or more of the grounds in the Adoption Act. *In re D.T.*, 212 Ill. 2d 347, 352 (2004); see 750 ILCS 50/1(D) (West 2022). At the unfitness hearing, the State bears the burden of proving, by clear and convincing evidence, that the parent is unfit to have a child. See *In re D.W.*, 214 Ill. 2d 289, 315 (2005).

¶ 24    Here, as counsel notes, respondent received satisfactory ratings for "administrative" tasks such as communicating with the agency. He regularly visited with the children but had trouble managing their behavior. He never completed any "substantive" tasks, including sex offender, substance abuse, and mental health evaluations, and a parenting course. He admittedly had

6

untreated mental health issues that caused him to question his ability to parent the children in the future. His home was unsuitable for them.

¶ 25    While perhaps some of the delay in obtaining a sex offender evaluation was explainable, the fact remains that a finding that respondent sexually abused one or more of his children previously was the primary reason that the case began, but the issue was never addressed. He was unable to complete recommended mental-health treatment because it caused him nightmares and mental anguish. Thus, there is no basis to question the court's finding that the State proved by clear and convincing evidence that respondent was an unfit parent.

¶ 26    Counsel further concludes that there is no reasonably meritorious basis to challenge the court's finding that terminating respondent's parental rights was in the children's best interests. Once a parent is found unfit, the trial court moves on to the second stage of termination proceedings, which involves a determination of whether it is in the minor's best interest to terminate parental rights. At this stage, the State must demonstrate, by a preponderance of the evidence, that the termination is in the minor's best interest. *In re D.T.*, 212 Ill. 2d at 366-67.

¶ 27    Here, the evidence supported the court's finding that the children's best interests required terminating respondent's parental rights. The children were happy and well cared for in their current placements. There was admittedly uncertainty about the permanency of those placements. Both foster mothers were rather elderly single women who did not consider themselves long-term placements for the children. Shuler, however, was exploring promising potential placements with relatives in Colorado. While the investigation was incomplete, Shuler was confident that the children could successfully be placed there and, if not, they could stay in their current placements for at least the foreseeable future.

¶ 28    By contrast, the evidence provided no reason to believe that respondent would ever be a viable option for the children. He acknowledged having multiple mental health issues. He denied having publicly questioned his ability to parent the children in spite of these issues, but he offered no concrete evidence that he was making progress with these issues. He had not undergone a sex offender evaluation, had not been evaluated for mental health or begun counseling, and did not have suitable housing. Thus, the court's finding that the children were better served by terminating respondent's parental rights was not against the manifest weight of the evidence.

¶ 29                                    CONCLUSION

¶ 30    As this appeal presents no issue of arguable merit, we grant counsel leave to withdraw and affirm the circuit court's judgment.

¶ 31    Motion granted; judgment affirmed.